1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| GAYLE BROCK,<br><br>              Plaintiff,<br><br>      vs.<br><br>COUNTY OF NAPA and DOES 1 through 50, inclusive,<br><br>              Defendants. | Case No:  C 11-0257 SBA<br><br>**ORDER**<br><br>Docket 28, 69 |

        This action arises from the death of Theodore Scott Mostek ("Mostek") who committed suicide while incarcerated in the Napa County Jail.  Mostek's mother, Gayle Brock ("Plaintiff"), commenced the instant action against Defendant County of Napa ("County") in the Napa County Superior Court alleging one state law claim for wrongful death.  See Compl., Dkt. 1.  On January 11, 2011, Plaintiff filed a second amended complaint ("SAC") alleging a federal claim under 42 U.S.C. § 1983 as well as five state law claims under California law.  See SAC, Dkt. 1.  The County removed the action to this Court on the basis of federal question jurisdiction.  Notice of Removal, Dkt. 1.

        The parties are presently before the Court on the County's motion for summary judgment or, in the alternative, partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Dkt. 29.  Plaintiff opposes the motion.  Dkt. 40.  Also before the Court is Plaintiff's ex parte application for leave to supplement her opposition.  Dkt. 69. The County opposes the ex parte application.  Dkt. 70.  Having read and considered the papers filed in connection with these matters and being fully informed, the Court hereby DENIES Plaintiff's ex parte application for leave to supplement her opposition and GRANTS the County's motion for summary judgment on Plaintiff's federal claim under §

1983.  The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, which are REMANDED to Napa County Superior Court.  The Court, in its discretion, finds these matters suitable for resolution without oral argument.  <u>See</u> Fed.R.Civ.P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

## I.    <u>BACKGROUND</u>

### A.    **Napa County Jail Operations**

The Napa County Jail is operated by the County.  Johnson Decl. ¶ 2, Dkt. 31.  The Napa County Department of Corrections ("NCDC"), a department of the County, is responsible for the coordination of all programs and services related to the care and management of inmates.  <u>Id.</u>  The County contracts with the California Forensic Medical Group ("CFMG") to provide medical care to inmates.  <u>Id.</u> ¶ 3, Exh. A.  CFMG employs or contracts with medical staff, e.g., nurses, doctors and other medical professionals, who provide health care for inmates at the jail.  <u>Id.</u> ¶ 3.

The County and CFMG share responsibility for providing mental health care to inmates.  Johnson Decl. ¶ 4.  CFMG provides a psychiatrist to deliver diagnostic services, medication monitoring and 5150 evaluations of inmates.  <u>Id.</u>  NCDC Mental Health Services ("NCDCMHS") provides mental health staff who deliver outpatient mental health services, including screening, crisis intervention, counseling and continuing care, as well as services relating to safety cell placements and inmates placed in restraints.  <u>Id.</u> ¶ 4, Exh. A.  The County employs the correctional staff at the Napa County Jail.  <u>Id.</u> ¶ 5.  With the exception of first aid and cardiopulmonary resuscitation ("CPR"), correctional officers do not provide medical or mental health care to inmates.  <u>Id.</u>

CFMG maintains medical and mental health records for Napa County Jail inmates.  Johnson Decl. ¶ 6, Exh. A.  NCDC correctional staff do not have access to inmates' medical and mental health records, which are confidential documents.  <u>Id.</u> ¶ 6.

NCDC has a number of policies pertaining to inmate classification and housing, inmate safety, and the provision of medical and mental health care to Napa County Jail inmates.  Johnson Decl. ¶ 7.  Those policies include, but are not limited to: (1)

Classification; (2) Inmate Safety and Security Checks; (3) Sobering Cell; (4) Suicidal

Inmates; (5) Medical and Dental; and (6) Special Transfers - Medical/Psychiatric Inmates.

Id., Exhs. B-G.

**B.    NCDC Training**

NCDC correctional officers receive on the job training with a Field Training Officer

when they are first employed by NCDC.  Johnson Decl. ¶ 20.  As part of that training, the

officers must read and become familiar with NCDC Policies and Procedures, including

those relating to suicidal inmates.  Id.  NCDC correctional officers must also complete all

training that is required by Title 15 of the California Code of Regulations, including the

Corrections Officer Core Course and annual required training.  Id.  The Corrections Officer

Core Course includes training relating to mental health issues, including suicide risk and

prevention in correctional facilities.  Id. ¶ 21.

**C.    Mostek's January 2009 Incarceration**

On January 8, 2009, Mostek was incarcerated in the Napa County Jail.  Johnson

Decl. ¶ 8.  At that time, a Medical Pre-Screening Questionnaire was completed in which

Mostek indicated that he was taking pain medications (Norco and Oxycontin), he was

currently under the care of a doctor for medical or psychiatric reasons, and that he had

attempted suicide more than 10 years ago but was not feeling suicidal at that time.  Id., Exh.

H.  Also on January 8, 2009, an Intake Triage Assessment form was completed, which

states that Mostek has a bad back and was taking Norco and Oxycontin.  Sterling Decl.,

Exh. A at 70-71, Dkt. 30-1.  In the "Plan & Comments" section of this form, it states "HC"

and "Monitor . . . for opiate detox."  Id. at 71.  The "Placement" section of the form states

"Holding Cell."  Id.

On January 9, 2009, Mostek was seen by CFMG physician Dr. James Luders and

placed on opiate detox protocol for heroin addiction with medications for a five-day period.

Sterling Decl., Exh. A at 53.  On January 14, 2009, the detox protocol was renewed for an

additional three days.  Id. at 60.  According to Dr. Luders' progress notes dated January 14,

2009, Mostek told him "I'm really having a lot of trouble here, I can't relax[.]  I feel like

- 3 -

banging my head."  Id.  While on detox protocol, Mostek was housed in a holding cell, where he was checked twice every thirty minutes by NCDC staff and regularly checked by CFMG personnel.  Johnson Decl. ¶¶ 9-10, Exh. I.

According to the "NCDC Chrono Log," Mostek was cleared by nursing to be housed in "GP" on January 12, 2009.  Johnson Decl., Exh. I.  On January 14, 2009, Mostek submitted an Inmate Request Form, requesting to be seen by medical staff.  Sterling Decl., Exh. A at 61.  The form states that Mostek was "Feeling . . . suicidal because of deficiency of medication."  Id.  The Chrono log indicates Mostek was "moved to HC for obs" at 6:30 p.m. on January 14, 2009.  Johnson Decl., Exh. I.

On January 15, 2009, Mostek met with NCDCCMHS mental health counselor Dale Gardner ("Gardner").  Sterling Decl., Exh. A at 63.  During this interview, Mostek demanded pain medication, to be taken out of the holding cell, and to be taken to court.  Id.  When Gardner asked Mostek whether he was currently suicidal, Mostek answered yes, stating that he thinks about it "all the time."  Id.  Gardner asked him the same question three more times with the "same results."  Id.  Mostek also told Gardner that he had "hung himself in the past and could do it again."  Id.  Following this meeting, Mostek was placed in a safety cell for his own protection.  Id. at 57, 63; Johnson Decl. ¶ 12, Exh. I.

On January 16, 2009, Gardner met with Mostek in his safety cell.  Sterling Decl., Exh. A at 62.  During this meeting, Mostek stated that "he wan [sic] not really suicidal; thought [he] could get his meds sooner."  Id.  Mostek then agreed "to safety and cooperation [with] officers" and was released from the safety cell.  Id. at 58, 62.  On January 19, 2009, Mostek was released from custody after bail was posted.  Johnson Decl. ¶ 15, Exh. I.

### D.    Mostek's March 2009 Incarceration

On March 2, 2009, Mostek was incarcerated in the Napa County Jail for failure to appear in court while on bail.  Turner Decl., Exh. F, Dkt. 42; Johnson Decl., Exh. I.  The "Booking Report" indicates that Mostek was facing a "third strike" if convicted of the pending charges, which included, among other things, possession of a controlled substance

and first degree residential burglary.  Id., Exh. F.  In his Medical Pre-Screening Questionnaire, Mostek indicated that he was taking Oxycontin and Norco, was under a doctor's care for medical reasons (herniated discs), had a history of seizures, had never attempted suicide and did not feel suicidal at the time.  Johnson Decl. ¶ 16, Exh. J.  A "Housing Classification Form" dated March 2, 2009 states that Mostek has a prior history of violence, disciplinary actions, mental health issues, withdrawals, and suicide attempts.  Turner Decl., Exh. I.  This form notes that Mostek was placed in a safety cell on January 15, 2009, and that Mostek "will withdraw from heroin."  Id.

On March 3, 2009, Mostek was placed on a five-day opiate detox protocol.  Sterling Decl., Exh. A at 13, 20, 35.  Mostek was also placed in a holding cell.  Johnson Decl. ¶ 18, Exh. I.  On March 8, 2009, the last day of the detox protocol, Mostek submitted an Inmate Request Form seeking renewal of his medications.  Sterling Decl., Exh. A at 39.  On March 9, 2009, detox protocol was extended for two days, id. at 13, and Mostek was moved from a holding cell to a special housing cell in Tank 1.  Johnson Decl. ¶ 18, Exh. I.  Tank 1 is a group of 8 cells that surround and open into a central day room, where inmates have their out of cell activity time.  Id. ¶ 18.  The doors to the cells are barred, not solid, so when the inmates are in their cells, each inmate can see into the day room and into some of the other cells, and they can hear and speak to each other.  Id.  The door into Tank 1 is also barred, so correctional officers and other people in the hallway outside of Tank 1 can hear the inmates housed in the Tank 1 cells.  Id.

On March 11, 2009, when detox medications were scheduled to end, Mostek submitted two Inmate Request Forms, requesting to be seen by medical and mental health staff.  Sterling Decl., Exh. A at 38, 42.[1]  On March 13, 2009, Mostek submitted another Inmate Request Form, asking for a "double mattress due to degenerated and herniated disks," a "CAT scan and X-ray due to chronic [back] pain + degeneration" and "Neurotin

---

[1] The handwriting on the forms submitted by Mostek is illegible.  The County contends that both forms request medications.  Def.'s Mtn. at 4.  Plaintiff does not dispute this contention.

[and] SOMA for pain and suffering." <u>Id.</u> at 37.

On March 13, 2009, CFMG staff responded to one of Mostek's March 11, 2009 request forms, stating "Please give us the name and location of your treating physician and sign release of information so we can get your medical history.  Also please give us details of this scheduled CAT scan." Sterling Decl., Exh. A at 38.  On March 14, 2009, CFMG staff responded to Mostek's March 13, 2009 request form in writing, stating that "You will need to provide your own Gabapentin if our Dr. decides to order it.  I will refer your request for 2nd mattress to Dr. Luders." <u>Id.</u> at 37.  Mostek was also seen by CFMG staff on March 14, 2009 and told that CFMG would "Fax ROI to North Bay Regional for collateral info, refer to M.D. for order for 2nd matt." <u>See id.</u> at 36.  On March 16 and/or March 17, CFMG staff met with Mostek regarding his complaints of pain. <u>Id.</u> at 34.  At this meeting, Mostek requested Neurontin, SOMA or Norco, or alternatively, Baclofen. <u>Id.</u>  Mostek was offered Motrin or Tylenol for pain but he refused to take either medication because they "upset his stomach."

On March 16, 2009, Gardner met with Mostek.  Sterling Decl., Exh. A at 41. During this meeting, Mostek informed Gardner that he needed Neurontin because it kept him "on an even keel." <u>Id.</u>  Gardner's notes from the meeting state, in part, "Reported S/i and Safety Cell placement in facility; cut wrists." <u>Id.</u>  In his deposition, Gardner explained "s/i" means Mostek "reported suicide in the past."  Gardner Dep. at 70:2-3, Dkt. 43.  When asked if "he reported suicide, and that he was put in the safety cell at this facility," Gardner answered "Yes." <u>Id.</u> at 70:4-5.  Gardner also testified that he did not recall asking medical personnel about whether Mostek had cut his wrists or not. <u>Id.</u> at 74:8-75:3.  However, Gardner stated that he knew Mostek had not cut his wrists "in the last period that he was [incarcerated] at Napa County" (i.e., January 2009) because he had reviewed the "previous two notes" before the interview. <u>Id.</u> at 70:22-71-8.  Gardner also testified that he did not investigate Mostek's claim of previous suicide attempts and did not know Mostek was facing a third strike when he interviewed him on March 16, 2009. <u>Id.</u> at 59:13-25, 79:18-23.  At the March 16, 2009 meeting, Mostek did not tell Gardner he was facing a third

strike.  Id. at 80:11-13

On March 17, 2009, a Health Inventory and Communicable Disease Screening form was completed and signed by Mostek, which states, among other things, that Mostek had back problems, a history of mental health treatment and a history of seizures.  Sterling Decl., Exh. A at 48.  The form also states that Mostek did not have any suicidal thoughts at that time or history of suicide attempts, and that he is currently working with "mental health."  Id.

On March 18, 2009, Gardner referred Mostek to a CFMG Telepsychiatrist for an appointment regarding his request for Neurontin.  Gardner Dep., Exh. E.  On that same day, Mostek spoke with Dr. Stancil Johnson regarding his request for Neurontin.  Sterling Decl., Exh. A at 40.  According to Dr. Johnson's report, Mostek told Dr. Johnson that he was facing a third strike, that he had a history of being bipolar and having manic episodes, and that he wants to be placed on Neurontin for seizures.  Id.  Dr. Johnson's report states that Mostek had not been evaluated by CFMG on "the medical side for this and I specifically ask they do so."  Id.  Dr. Johnson told Mostek that he could not prescribe him Neurontin; noting that he "did not get a sufficient history of bipolar to warrant psychotropic medication at this point."  Id.  Instead, Dr. Johnson prescribed Mostek "doxepin" for 30 days,[2] stating that he would "entertain the history of bipolar disorder and make further evaluation and try to stabilize what symptomatology [he] see[s] now with psychotropic medication and await further development on the history of seizures from the medical side."  Id.

On March 20, 2009, during a routine safety and security check at about 2:30 a.m., correctional officer Adam Rusin found Mostek in his cell "hanging by his neck with what

---

[2] At his deposition, Dr. Johnson testified that he prescribed Mostek Doxapram, which is an "old antidepressant" that would "take away some of [Mostek's] anxiety." Johnson Dep. at 25:20-26:4, Dkt. 30-2.  Dr. Johnson prescribed Mostek a dose of 50 milligrams of Doxapram, which he testified would operate as a "calming agent." Id. at 26:1-4.

appeared to be a piece of bed sheet."[3]  Johnson Decl., Exh. K.  Officer Rusin radioed for assistance and cut Mostek down.  Id.  At around 2:31 a.m., several NCDC officers and a CFMG nurse responded to Mostek's cell.  Id.  At about 2:32 a.m., the nurse examined Mostek and found no pulse.  Id.  At this time, a correctional officer left Mostek's cell to call 911.  Id.  The nurse and correctional officers performed chest compressions on Mostek from 2:32 a.m. until approximately 2:42 a.m., when the Napa City Fire and Paramedics arrived.  Id.  Shortly thereafter, the paramedics declared Mostek dead.  Id.

## II.     DISCUSSION

### A.     Legal Standard

"A party may move for summary judgment, identifying each claim . . . or the part of each claim . . . on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  A material fact is one that could affect the outcome of the suit under the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For a dispute to be "genuine," a reasonable jury must be able to return a verdict for the nonmoving party.  Id.

The moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial."  Anderson, 477 U.S. at 256 (1986).  When the nonmoving party bears the burden of proving the claim, the moving party need only point out through argument that the nonmoving party does not have enough evidence of an essential element of his claim to carry his ultimate burden of persuasion at trial.  Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001); Fairbank v. Wunderman Cato Johnson, 212 F.3d 528, 532 (9th Cir. 2000).

Once the moving party has met its burden, the burden shifts to the nonmoving party

---

[3] Correctional officer Kevin Skillings talked to Mostek on "the day [he] died."  Dkt. 42.  When asked to describe Mostek's demeanor, Officer Skillings stated that Mostek "was always quiet, and he just kept to himself, and that's the way he was that night, too." Skillings Dep. at 14:21-15:2, Dkt. 43.

to designate specific facts showing a genuine issue for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  A party asserting that a fact is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed.R.Civ.P. 56(c)(1)(A).

To carry its burden, the nonmoving party must show more than the mere existence of a scintilla of evidence, Anderson, 477 U.S. at 252, and "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In fact, the nonmoving party must come forth with evidence from which a jury could reasonably render a verdict in the nonmoving party's favor.  Anderson, 477 U.S. at 252.  In determining whether a jury could reasonably render a verdict in the nonmoving party's favor, all justifiable inferences are drawn in the nonmoving party's favor.  Id. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  Dias v. Nationwide Life Ins. Co., 700 F.Supp.2d 1204, 1214 (E.D. Cal. 2010).  To establish a genuine dispute of material fact, a Plaintiff must present affirmative evidence; bald assertions that genuine issues of material fact exist are insufficient.  Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007).  Further, evidence that is merely colorable or that is not significantly probative, is not sufficient to withstand a motion for summary judgment.  Anderson, 477 U.S. at 249-250 (citations omitted).

It is not the court's task "to scour the record in search of a genuine issue of triable fact."  Keenan v. Allan, 91 F.3d 1275, 1278 (9th Cir. 1996).  Counsel have an obligation to lay out their support clearly.  Carmen v. San Francisco Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found."  Id.  The gist of a summary judgment

motion is to require the adverse party to show that it has a claim or defense, and has evidence sufficient to allow a jury to find in its favor on that claim or defense.  Id.

**B.     Ex Parte Application for Leave to Supplement Opposition**

Plaintiff requests leave to supplement her opposition to include "newly found information."  Dkt. 69.  Specifically, Plaintiff seeks to add information that "another inmate at the Napa County Jail committed suicide in the same manner as decedent in the present case . . . on November 1, 2012."  Id.  The County opposes Plaintiff's application on the ground that Plaintiff has failed to demonstrate that this evidence is relevant to any issue in this case.  Dkt. 70.  Under Civil Local Rule 7-3(d), once a reply has been filed, no additional memoranda, papers or letters may be filed without prior Court approval, except in two narrow circumstances: (1) if new evidence has been submitted in the reply; or (2) if the additional memoranda, paper or letter brings to the Court's attention a relevant judicial opinion published after the date the opposition or reply was filed.  Civ. L.R. 7-3(d).

The Court finds that Plaintiff has failed to demonstrate that leave to supplement her opposition is warranted.  Plaintiff's request does not fall within the two narrow circumstances set forth under Civil Local Rule 7-3(d).  Nor has Plaintiff shown good cause to supplement her opposition.  Plaintiff has failed to show that the information she seeks to add to her opposition is relevant to the resolution of any issue before the Court on the County's motion for summary judgment.  Plaintiff's ex parte application does not explain why a suicide that occurred at the Napa County Jail in November 2012 is relevant to the claims in this case, which arise out of a suicide that occurred in March 2009.  Accordingly, Plaintiff's ex parte application for leave to supplement her opposition is DENIED.

**C.     Evidentiary Objections**

In its reply brief, the County contends that certain Grand Jury Reports referenced in Plaintiff's opposition are inadmissible.  Def.'s Reply at 18-19.  Specifically, the County objects to the Grand Jury Reports on the grounds that they are not authenticated, they "contain inadmissible opinion testimony by unknown lay persons," and they include "multiple levels of hearsay."  Id. at 19.  In addition, the County argues that the reports

"should be excluded under FRE 403 due to the risk of unfair prejudice and confusion of the issues." Id. at 20.  Plaintiff did not respond to this objection.

A review of Plaintiff's opposition reveals that Plaintiff does not cite to any portion of a Napa County Grand Jury Report in support of her position.  Instead, the reports are referenced in connection with the opinion of Plaintiff's correctional expert, Jeffrey Hislop.[4] See Pl.'s Opp. at 2, 15, 21.  Plaintiff's opposition states that certain Napa County Grand Jury Reports were "considered as part of the opinion of [her] expert witness . . . Hislop." Id. at 2.[5]  Federal Rule of Evidence 703 allows an expert to base an opinion "on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed.R.Evid. 703; see United States v. W.R. Grace, 504 F.3d 745, 763 (9th Cir. 2007).  The County does not argue that the Grand Jury Reports are not the kind of facts or data that experts in Hislop's field would "reasonably rely on."  Accordingly, the County's objections to the Grand Jury Reports are OVERRULED.  Moreover, because Plaintiff does not cite to any portion of a Grand Jury Report in her opposition, the Court does not rely on any statements contained in the reports considered by Hislop in resolving the instant motion.  As such, the County's request to exclude the evidence is DENIED as MOOT.

---

[4] According to Hislop, his "area of expertise includes but is not limited to: use of force; less lethal alternatives to deadly force (equipment and tactics); modern police administration and supervision, including policies, procedures, and current law enforcement practices; firearms, internal affairs investigations and disciplinary matters; special weapons and tactics administration and training: custody/corrections operations and policy and procedures." Dkt. 22.

[5] Hislop avers that he reviewed Napa County Grand Jury Reports for 2005-2010 and "discovered," among other things that the "Grand Juries" have reported numerous issues including: lack of adequate leadership, the accidental early release of over 25 inmates from the jail, concern over the use of the inmate welfare fund, concern over NCDC's failure to monitor recidivism, concern regarding the safety of the corrections guards at the facility, and concerns regarding NCDC's ability to properly manage and handle the mentally ill. Hislop Decl. ¶ 2.

The County also objects to Plaintiff's reliance on "statements made by Ernest Crane (sic), the inmate who was housed in the cell next to Mostek at the time of Mostek's death." Def.'s Reply at 20.  The only mention of Ernest Craine in Plaintiff's opposition appears on page 8.  Plaintiff's opposition states in full: "Ernest Craine, inmate in the cell right next to Mostek, said that he heard a noise and knew that something had happened to Mostek but did not try to call out because he knew that no one would hear him." Id. at 8.  The County argues that Craine was not deposed in this case and "his statements are not sworn but are contained in the Coroner's investigative report prepared by Deputy Matthew Macomber," and, as such, "constitute hearsay and are inadmissible under FRE 801." Id.  The County further argues that even if Deputy Macomber's "report itself is a business record under FRE 803 or subject to some other exception to the hearsay rule, Craine's statements are a second level of hearsay, and there is no exception that applies to them." Id. at 20.  Plaintiff did not respond to this objection.

Pursuant to Federal Rule of Evidence 803(8), in a civil case, a record or statement of a public office setting forth "factual findings resulting from a legally authorized investigation" are not excluded by the hearsay rule, unless the sources of information or other circumstances indicate lack of trustworthiness.  Fed.R.Evid. 803(8).  Even assuming that the investigative report prepared by Deputy Macomber is admissible under the public-records exception under 803(8), it is well established that statements made by third persons not under a "duty to report" must satisfy a separate hearsay exception in order to be admissible.  See Lang v. Cullen, 725 F.Supp.2d 925, 960 (C.D. Cal. 2010) (Bemis v. Edwards, 45 F.3d 1369, 1372 (9th Cir. 1995)).  Accordingly, because Plaintiff has not shown that Craine's statements are independently admissible under an exception to the hearsay rule, the County's objection is SUSTAINED.

### D.   Motion for Summary Judgment

#### 1.   42 U.S.C. § 1983

The operative complaint does not allege any claims against an individual Defendant. See SAC.  The only named Defendant is the County.  Id.  The SAC alleges that unnamed

County employees working at the time of Mostek's death were specifically informed by Mostek that he would terminate his life if placed in a solitary confinement cell with a sheet or similar item.  Id. ¶ 11.  The SAC further alleges that unnamed County employees had knowledge to a substantial certainty that Mostek would commit suicide after being placed in a solitary confinement cell and that "said defendants" knowingly and intentionally placed him in the cell with a bed sheet or other similar item.  Id.  The SAC also alleges that "said defendants" acted with deliberate indifference with regard to Mostek's life when they placed him in a solitary confinement cell with a bed sheet or similar item.  Id.  According to Plaintiff, Mostek's death was caused by the County "because of its official policies" and "its customs and practices," which were followed by "defendant employees."  Id. ¶ 12.  Plaintiff claims that "said policies, customs and practices were the 'moving force' behind the deprivation of plaintiff's constitutional rights."  Id. ¶ 13.

The County moves for summary judgment on the ground that Plaintiff does not have evidence of an official policy, custom or practice that gives rise to municipal liability under § 1983.  Def.'s Mtn. at 12-22.  In response, Plaintiff contends that summary judgment is inappropriate because there is a genuine dispute of material fact as to whether the County: (1) failed to provide adequate suicide prevention training to its officers; (2) was deliberately indifferent to the medical needs of Mostek; (3) was deliberately indifferent in creating and enforcing its own official policies regarding suicide prevention, housing of inmates, and medical and psychological training and care; and (4) employed a standard operating procedure of deliberate indifference toward the inmates at the jail based upon its "numerous failures."  Pl.'s Opp. at 11-23.

Although the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment's protection against cruel and unusual punishment, applies to pretrial detainees, the same standards are applied in both cases.  Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).  The Supreme Court has held that the Eighth Amendment imposes a duty upon prison officials to provide humane conditions of confinement, including ensuring that inmates "receive adequate food, clothing, shelter, and

medical care" and "taking reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 833 (1994) (internal quotation marks omitted).

Title 42 U.S.C. § 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."  A municipality or other local government may be liable under § 1983 if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person 'to be subjected' to such deprivation."  Connick v. Thompson, 131 S.Ct. 1350, 1359 (2011) (citing Monell v. N.Y. City Dep't of Soc. Servs., 436 U.S. 658, 692 1978)).  Because a County cannot be held vicariously liable under § 1983 for their employees actions, plaintiffs who seek to impose liability on a County under § 1983 must prove that "action pursuant to official municipal policy" caused their injury.  Connick, 131 S.Ct. at 1359.

To establish municipal liability under § 1983, a plaintiff must show that (1) he was deprived of a constitutional right; (2) the County had a policy; (3) the policy amounted to a deliberate indifference to his constitutional rights; and (4) the policy was the moving force behind the constitutional violation.  Burke v. County of Alameda, 586 F.3d 725, 734 (9th Cir. 2009).  A County may be held liable under § 1983 under three theories.  Clouthier v. Cnty. of Contra Costa, 591 F.3d 1232, 1249 (9th Cir. 2010).  First, a County may be held liable when implementation of its official policies or established customs inflicts the constitutional injury.  Id.  Second, a County may be held liable under § 1983 for acts of "omission," when such omissions amount to the local government's own official policy. Clouthier, 591 F.3d at 1249.  Third, a County may be held liable under § 1983 when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it.  Id. at 1250.

### a.      Failure to Train

Plaintiff contends that there is a triable issue of fact as to whether the County failed to provide adequate training to its correctional officers.  Pl.'s Opp. at 11.  A § 1983 plaintiff alleging a policy of failure to train must show: (1) that a County employee violated plaintiff's constitutional rights; (2) that the County has a custom or policy that amounts to deliberate indifference; and (3) that this custom or policy was the moving force behind the employee's violation of plaintiff's constitutional rights in the sense that the County could have prevented the violation with an appropriate policy.  Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1194 (9th Cir. 2002).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  Connick, 131 S.Ct. at 1359.  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  Id.  To satisfy the statute, a municipality's failure to train must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  Id. (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989)).

"[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his or her action."  Connick, 131 S.Ct. at 1360 (quotation marks omitted).  "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."  Id.

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  Connick, 131 S.Ct. at 1360.  "Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—

necessary to trigger municipal liability." Id. (internal quotation marks omitted). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Id. In City of Canton, however, the Court did not foreclose the possibility that, "in a narrow range of circumstances," the unconstitutional consequences of failing to train could be "so patently obvious" that a municipality could be liable under § 1983 without proof of a pre-existing pattern of violations. Connick, 131 S.Ct. at 1361.

Finally, in addition to proving deliberate indifference, the plaintiff must prove that the alleged training deficiency was the moving force that actually caused the constitutional violation. See Connick, 131 S.Ct. at 1358 n. 5. "[P]roving that a municipality itself actually caused a constitutional violation by failing to train the offending employee presents difficult problems of proof, and [a court] must adhere to a stringent standard of fault, lest municipal liability under § 1983 collapse into respondeat superior." Connick, 131 S.Ct. at 1365 (internal quotation marks omitted).

Here, Plaintiff broadly contends that the "officers at the jail were not adequately trained in suicide prevention" because all of the "officers deposed" by Plaintiff testified that they were "not regularly trained in suicide prevention, if . . . they were trained at all." Pl.'s Opp. at 13. In support of this contention, Plaintiff relies on the opinion of her correctional expert, Hislop. Id. Hislop opines that the correctional officers at the Napa County Jail were not adequately trained because suicide training was not conducted on a "regular basis," i.e., "once every two years." Hislop Decl. ¶ 12. In his expert report, Hislop concludes that "[t]here was evidence that the jail staff responsible for the care as well as custody of the inmates were insufficiently trained. There was evidence that suicide prevention training was not conducted regularly or frequently. Responding staff were not properly trained or equipped to administer CPR." Dkt. 22. In reaching this conclusion, Hislop states that "[t]he officers were vague as to the frequency and specifics of suicide prevention training. One C/O mentioned that the training received was applicable to street officers rather than custody situations. . . . CPR updates appeared not to have occurred.

Staff did not respond with or use cpr masks."  Id.  According to Plaintiff, the "alleged training at the jail on suicide prevention (if any) was . . . woefully inadequate based on the depositions of the officers."  Pl.'s Opp. at 14.

Plaintiff has not adduced evidence establishing a "pattern of similar constitutional violations by untrained employees" from which the Court can draw the inference that the County was aware that its suicide training was inadequate and chose to do nothing in the face of this knowledge.  While Plaintiff asserts that "there were two suicides and three attempted at the jail in one year," Pl.'s Opp. at 15, Plaintiff does not argue or proffer any evidence showing that there were any prior incidents "similar to the violation at issue here" such that a reasonable jury could find that the County was "on notice that specific training was necessary to avoid this constitutional violation."  Connick, 131 S.Ct. at 1360.

In support of her assertion that "there were two suicides and three attempted at the jail in one year," Plaintiff cites paragraphs 2 and 17 of Hislop's declaration.  However, neither of these paragraphs mention any suicide or attempted suicide at the Napa County Jail.  A review of the record reveals that support for Plaintiff's assertion is found in Hislop's expert report.  According to Hislop, "[t]here were two suicides in 2009 as well as three more attempts."  Dkt. 22.  Hislop's report, however, does not identify the specific factual basis for this statement or provide any description or explanation of the circumstances surrounding the "two suicides in 2009 as well as three more attempts."  As such, it is unclear whether these incidents are similar to the constitutional violation alleged in this case.  In addition, it is unclear whether these incidents occurred before or after Mostek's death in March 2009.  See Connick, 131 S.Ct. at 1360 n.7 ("contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide 'notice to the cit[y] and the opportunity to conform to constitutional dictates' ").  The evidence adduced by Plaintiff does not establish a genuine issue of material fact on the issue of whether there was a pattern of similar constitutional violations by untrained County employees.

Without evidence of any other prior similar constitutional violations of the kind alleged in this case, Plaintiff cannot establish liability unless Plaintiff demonstrates that the

"single-incident" theory of municipal liability applies.  Although a pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate a municipality's "deliberate indifference" for purposes of a failure to train claim, a plaintiff can rely on a "single-incident" theory that the constitutional violation was the "obvious" consequence of inadequate training.  Connick, 131 S.Ct. at 1360-1361 (citations omitted).  Under this theory, Plaintiff must establish that this case presents one of those "rare" circumstances the Supreme Court hypothesized in City of Canton in which the need for training is so obvious that the County's failure to provide that training amounts to deliberate indifference to constitutional violations.  See Canton, 489 U.S. at 390 n. 10; see Connick, 131 S.Ct. 1361 (the possibility of "single-incident liability" theory left open by City of Canton exists only "in a narrow range of circumstances" where "the unconstitutional consequences of failure to train [are] patently obvious").[6]  These "circumstances" generally involve incidents arising from a total lack of training, not simply an assertion that a municipal employee was not trained about "the specific scenario related to the violation."  Connick, 131 S.Ct. at 1363.

The Court finds that Plaintiff has failed to establish a genuine issue of material fact as to whether the County is liable under the "single-incident" theory of liability.  Plaintiff has not presented evidence from which a reasonable jury could conclude that Mostek's death was the "patently obvious" consequence of the County's failure to provide specific training such that Plaintiff need not show a pattern of similar constitutional violations by untrained employees to demonstrate the County's deliberate indifference.  Plaintiff has not shown that this case falls within that "narrow" and "rare" range of cases hypothesized by

---

[6] The rare situation was described in City of Canton through "the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force."  Connick, 131 S.Ct. at 1361.  The Court's hypothesis was premised on the assumption that the municipality had decided not to train its officers about the constitutional limits of the use of force.  Id.  Under such circumstances, the highly predictable consequence that deadly force could be misused in violation of citizens' rights could be deemed so obvious as to reflect deliberate indifference.  Id.

City of Canton based upon an "obvious need for some form of training," particularly since Plaintiff failed to demonstrate a complete lack of suicide training, establish the existence of a "particular glaring omission" in the County's suicide training program, or show that the correctional officers had an "utter lack of an ability to cope with constitutional situations" that existed in the hypothesized single-incident case.  See Connick, 131 S.Ct. 1361, 1363; Board of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 409-410 (1997).

Indeed, Plaintiff has not shown that the County's training program is inadequate, let alone that the County's failure to train reflects a "deliberate" or "conscious" choice by the County that amounts to a policy for which the County is responsible.  The County has presented evidence that its correctional officers are provided suicide prevention training, including suicide prevention training as part of their "Core Course" training and as part of their on the job training.  See Johnson Decl. ¶¶ 20-21, Exh. L.  In response, Plaintiff has not adduced evidence establishing a particular omission or deficiency in the County's suicide prevention program.  Instead, Plaintiff generally argues that the training received by correctional officers was inadequate because the officers were not trained in suicide prevention on a regular basis.  Pl.'s Opp. at 13.  In support of her position, Plaintiff focuses on the deposition testimony of four correctional officers regarding the training they recalled receiving.  See id. at 13-15.

Specifically, Plaintiff asserts that Officer "Russin (sic) testified that he did not receive any training before the incident and alleged 'minor' training after the incident"; that Officer "Skillings testified to details of his training at the academy, but no details regarding training specific to suicide prevention at the jail"; that Officer "Kemp testified that he only received on the job training and that his training consisted of no required coursework or review of policies, and that he was permitted to train other officers after receiving that training"; and that Officer "Daniels . . . did not seem to know a definite policy for dealing with 'despondent' inmates."  Pl.'s Opp. at 14-15.  In support of these assertions, Plaintiff cites "See declaration of Jesse Turner," id., which does not comply with Rule 56.  See Fed.R.Civ.P. 56(c)(1)(A) (a party asserting that a fact is genuinely disputed must support

the assertion by "citing to particular parts of materials in the record").  To demonstrate a genuine issue for trial, the party opposing summary judgment must direct the court's attention to specific, triable facts; general references without page or line numbers are not sufficiently specific.  See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); see also Forsberg v. Pac. Northwest Bell Tel. Co., 840 F.2d 1409, 1418 (9th Cir. 1988) (courts are not required to comb the record to find some reason to deny a motion for summary judgment).

Moreover, Plaintiff's failure to train argument fails because when a municipality's culpability for a deprivation of rights is predicated on a failure to train, " 'the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform," and not merely on the training deficiencies of specific officers.  See City of Canton, 489 U.S. at 390-391 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."); Blankenhorn v. City of Orange, 485 F.3d 463, 484-485 (9th Cir. 2007) ("[A]bsent evidence of a program-wide inadequacy in training, any shortfall in a single officer's training can only be classified as negligence on the part of the municipal defendant—a much lower standard of fault than deliberate indifference."); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1293 (11th Cir. 2009) (because the focus must be on the adequacy of the training programs in relation to the tasks the particular officers must perform, it is irrelevant what training each specific officer present at the scene was given or retained).  The fact that further training might have prevented any violation is insufficient to "fasten" liability on the municipal actor.  See City of Canton, 489 U.S. at 391 ("Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.  Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.  And plainly, adequately trained officers occasionally make

mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.").

Furthermore, even assuming that there was a failure to train and that the County was deliberately indifferent to the consequences of that lack of training, Plaintiff has failed to establish that the alleged inadequate training was the moving force behind Mostek's death. Plaintiff has not identified a nexus between Mostek's death and a particular deficiency in the correctional officers' training that would have been avoided had the officers been trained under a program that was not deficient in the identified respect. According to Plaintiff, her correctional expert concluded that Mostek's death was "caused by the conduct of [the] County, including [the] failure to train on an obvious issue." Pl.'s Opp. at 16. In support of this conclusory assertion, Plaintiff directs the Court to paragraphs 12-14 and 17 of Hislop's declaration." Id.

In his declaration, Hislop concludes that officers at the Napa County Jail were not adequately trained. Hislop Decl. ¶¶ 13, 17. Hislop avers that "[t]here was overall, obvious lack of training including an *apparent* lack of CPR training. . . ." Id. (emphasis added). Hislop bases this conclusion on his "brief review" of the "alleged" training records of several correctional officers and their deposition testimony. Id. ¶¶ 13-14, 17. With regard to causation, Hislop opines that "the death of Mostek was proximately caused by the recklessness of the policy maker and the jail staff as evidenced by inadequate training on suicide prevention, CPR, and Housing Classification." Id. ¶ 17. Hislop further states, without elaboration, that "[i]ssues raised by the grand jury[,] including lack of adequate leadership, jail staff safety, and the jail's inabilit[y] to deal with the mentally ill . . . further strengthen [my] conclusion."[7] Id. The Court finds that Hislop's conclusory opinion is insufficient to avoid summary judgment. See Soremekun v. Thrifty Payless, Inc., 509 F.3d

---

[7] While Plaintiff's opposition mentions the fact that "Grand Juries from 2005-2010 have reported numerous issues of the NCDC," Plaintiff has failed to direct the Court to any specific statements or findings set forth in any Napa County Grand Jury Report or otherwise explain with any specificity the relevance of these reports to her § 1983 claim. Plaintiff's opposition provides no meaningful discussion of these reports.

978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."). Plaintiff has not proffered sufficient evidence to establish a genuine issue of material fact as to whether any particular omission or deficiency in the County's training program was the moving force behind Mostek's death.

Finally, the Court notes that, without any elaboration or analysis, Plaintiff asserts that "the failure to relay the information regarding Mostek's suicidality" was a failure to train" and that "a proper Housing Classification procedure is to ensure, in part, that suicidal persons are properly cared for and that proper training is required to ensure this."  Pl.'s Opp. at 14.  Other than these conclusory assertions, Plaintiff offers no discussion regarding these issues.  Plaintiff does not cite any evidence in support of the first assertion.  In support of the second assertion, Plaintiff directs the Court to paragraph 17 of her correctional expert's declaration, which opines "[t]here was improper and inadequate training with regard to proper housing and with regard to relaying information regarding mental issues to the officers at the jail."  Hislop Decl. ¶ 17.  Hislop further states that "[a] review of the deposition transcripts of the officers, and the alleged training records," exposes the "inadequacies" of the County's training.  Id.  However, conclusory expert assertions cannot raise triable issues of material fact on summary judgment.' "  Lake v. First Nat. Ins. Co. of America, 2011 WL 873142, at * 2 (N.D. Cal. 2011) (Armstrong, J.) (quoting Sitrick v. Dreamworks, LLC, 516 F.3d 993, 1001 (Fed. Cir. 2008)); see also Soremekun, 509 F.3d at 984.  Accordingly, Plaintiff has failed to raise a genuine issue of material fact as to whether these alleged deficiencies in the County's training program amount to deliberate indifference and were the moving force behind Mostek's death.  See F.T.C. v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) (non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment).

### b.     Medical Indifference

Plaintiff contends that a triable issue of fact exists as to "whether the County failed to provide competent medical care to Mostek because Gardner was not adequately licensed

or trained to work in his capacity at the jail, and because other circumstances at the jail relating to medical care prove Defendant's deliberate indifference."  Pl.'s Opp. at 16.  More specifically, Plaintiff argues that Gardner failed to provide competent care to Mostek because, among other things, he did not place him in a safety cell or a cell with another inmate where Mostek would be within view of an officer at all times during the March period of incarceration.  Id. at 18.  Plaintiff further argues that Gardner's certification as a Marriage and Family Therapist is not sufficient to perform counseling and evaluation of inmates at risk of suicide."  Id.  In support of these contentions, Plaintiff cites "See Declaration of Dr. Martin Williams," id., which is improper.  See Fed.R.Civ.P. 56(c)(1)(A) (a party asserting that a fact is genuinely disputed must support the assertion by "citing to particular parts of materials in the record"); Southern Cal. Gas Co., 336 F.3d at 889 (the party opposing summary judgment must direct the court's attention to specific, triable facts).

According to Plaintiff, "the care provided by Gardner at the jail was incompetent and that the jail was therefore deliberately indifferent."  Pl.'s Opp. at 19.  Plaintiff further argues that the following "circumstances substantiate the fact that the medical care was incompetent":  the County's failure to have a "vehicle" for informing officers that inmates may be at risk for suicide, the County's failure to adequately train correctional officers in suicide prevention, and the County's failure to have an enforceable policy regarding suicide prevention.  Id.  Plaintiff claims that this conduct "illustrates a custom and policy of inadequate and incompetent medical care within the jail."  Id.

As an initial matter, the Court notes that Plaintiff has not argued or adduced evidence showing that Gardner violated Mostek's constitutional rights by failing to address his serious medical needs.  See Gibson, 290 F.3d at 1187-1188 (under the Eighth Amendment, "a person is liable for denying a prisoner needed medical care only if the person 'knows of and disregards an excessive risk to inmate health and safety' "); Simmons, 609 F.3d at 1018 (to show that a correction facility official violated a constitutional right by failing to address his medical needs, a plaintiff must show that the official was (1)

- 23 -

subjectively aware of the serious medical need; and (2) failed to adequately respond). Plaintiff has not proffered evidence demonstrating that Gardner was subjectively aware that Mostek was in substantial danger of killing himself yet deliberately ignored such risk.  See Simmons, 609 F.3d at 1018-1019.

Instead, Plaintiff points to the opinion of her medical expert, who states, among other things, that Gardner provided incompetent care because he should have taken action to ensure that Mostek was in a safety cell or a cell with another inmate where correctional officers could observe him.  Pl.'s Opp. at 18 (citing "Declaration of Dr. Martin Williams"). At most, Plaintiff has raised an issue as to whether Gardner engaged in malpractice or was negligent in treating Mostek.  However, a showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eight Amendment. Simmons, 609 F.3d at 1019.

Moreover, even assuming that Gardner was deliberately indifferent to Mostek's serious medical needs, Plaintiff has failed to adduce sufficient evidence to establish that the alleged unconstitutional act results from: "(1) an employee acting pursuant to an expressly adopted official policy; (2) an employee acting pursuant to a longstanding practice or custom; or (3) an employee acting as a 'final policymaker.' "  Delia v. City of Rialto, 621 F.3d 1069, 1081-1082 (9th Cir. 2010).  "A plaintiff cannot prove the existence of a municipal policy or custom based solely on the occurrence of a single incident or unconstitutional action by a non-policymaking employee."  Davis v. City of Ellensburg, 869 F.2d 1230, 1233 (9th Cir. 1989).  The Supreme Court has explained:

> Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.  Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved.  But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation.

City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-824 (1985).

In the absence of a formal municipal policy, a plaintiff must show a "longstanding

- 24 -

practice or custom which constitutes the standard operating procedure of the local governmental entity."  Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996).  A plaintiff must establish that the custom or practice is "so 'persistent and widespread' that it constitutes a 'permanent and well settled city policy.' "  Id. ("Liability for improper custom [under Monell] may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency, and consistency[.]").

Here, Plaintiff contends that municipal liability can be predicated on one incident of inadequate medical care.  In support of her position, Plaintiff cites Cabrales v. County of Los Angeles, 864 F.2d 1454 (9th Cir. 1988), vacated on other grounds, 490 U.S. 1087 (1989), opinion reinstated, 886 F.2d 235 (9th Cir. 1989).  Plaintiff's reliance on Cabrales is misplaced.  In that case, the plaintiff alleged that the County had a policy or custom that resulted in serious medical under-staffing at the jail such that "psychiatric staff could only spend minutes per month with disturbed inmates."  Id. at 1461.  The Ninth Circuit concluded that the district court properly denied a motion for summary judgment because there was evidence that medical understaffing at the jail constituted a policy of the County through its policymaker amounting to "deliberate indifference to the medical needs of the inmates at the jail," which directly contributed to the decedent's suicide.  Id. at 1461-1462 (noting that "[t]he district court could conclude that lack of time and resources meant, in the decedent's case, that any psychological illness he had would go undiagnosed and untreated").

Plaintiff has not proffered evidence showing that the County through a policymaker had a policy amounting to "deliberate indifference to the medical needs of the inmates at the jail."  At most, Plaintiff has introduced evidence that one inmate received inadequate medical care from Gardner on one occasion.  However, even assuming Plaintiff has shown a constitutional violation, proof of a single incident of unconstitutional activity is not sufficient to impose municipal liability, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which can be attributed to a County policymaker.  Plaintiff has not offered such proof.

Contrary to Plaintiff's suggestion, her medical expert's opinion that Gardner is not qualified to perform counseling and evaluation of inmates at risk of suicide, does not create a genuine issue of material fact as to whether the County had a policy of deliberate indifference to the medical needs of the inmates at Napa County Jail.  Plaintiff has not argued, let alone shown, that the County had a policy or custom of employing unqualified medical staff amounting to deliberate indifference to the medical needs of inmates.  As for the remaining "circumstances" that Plaintiff claims "substantiates the fact that the medical care was incompetent" and "illustrates a custom and policy of inadequate and incompetent medical care within the jail," the conclusory statements offered by Plaintiff are insufficient to avoid summary judgment.  See Surrell v. California Water Service Co., 518 F.3d 1097, 1103 (9th Cir. 2008) ("Conclusory statements without factual support are insufficient to defeat a motion for summary judgment.").  In short, Plaintiff has failed to avoid summary judgment by coming forward with evidence from which a jury could reasonably render a verdict in her favor.  Anderson, 477 U.S. at 252.

### c.      County Policies

Plaintiff contends that there is a triable issue of fact as to whether the County was deliberately indifferent with respect to its policies regarding suicide prevention, housing of inmates, and medical and psychological training and care.  Pl.'s Opp. at 20.  More specifically, Plaintiff argues that the County's "suicide prevention practices" at the Napa County Jail "were a policy and custom of omission closely related to Mostek's injury." Id. at 21.  In addition, Plaintiff argues that the County's "housing practices are . . . a policy and custom of omission closely related to Mostek's injury." Id. at 22.

Municipal liability may be imposed where a municipality's omission led to a constitutional violation by its employee.  Gibson, 290 F.3d at 1186.  Under this route to municipal liability, the "plaintiff must show that the municipality's deliberate indifference led to its omission and that the omission caused the employee to commit the constitutional violation." Id.  Deliberate indifference requires a showing "that the municipality was on actual or constructive notice that its omissions would likely result in a constitutional

violation."  Id.  To prove that the policies were the moving force behind the County employee's violation of plaintiff's constitutional rights, plaintiff must show that the County could have prevented the constitutional violation with an appropriate policy.  Id. at 1194.

### i.   Suicide Prevention

Without citation to evidence, Plaintiff broadly contends that that the County's "suicide prevention policy is only a suggestion for [correction officers], so that it seems [the County] had no enforcible [sic] suicide prevention policy at all."  Pl.'s Opp. at 21. According to Plaintiff, if "an adequate suicide prevention policy was required, it was clearly not followed or enforced."  Id.  Plaintiff also asserts, without evidentiary support, that the "jail failed to provide adequate training on psychological health (including necessary training on  . . . suicide prevention)," and has a "policy of refusing to communicate to guards the specific dangers faced by mental health inmates" including that an inmate has previously attempted suicide.  Id.  Finally, Plaintiff vaguely asserts that "the Napa County Grand Jury has raised concerns over the jail's ability to deal with mental health issues which is directly related to training. . . . It has been raising concern after concern over how the jail is run for at least half a decade including failures in leadership, organization, and especially safety . . . . Policy makers at the jail were . . . well informed regarding these failures. . . .  Both of Plaintiff's experts have testified to causation regarding these issues."  Id.

The Court finds that Plaintiff's conclusory assertions in support of this argument are insufficient to avoid summary judgment.  See Surrell, 518 F.3d at 1103.  Plaintiff did not adduce any evidence establishing a policy or custom of omission regarding the County's "suicide prevention practices" that was the moving force behind Mostek's death.  Plaintiff has not come forward with evidence from which a jury could reasonably render a verdict in her favor.

### ii.   Housing Policy

Without citation to evidence, Plaintiff points to the Napa County Jail's "ongoing policy and procedure against communicating the housing classification information to the

guards" as one of the deficiencies of the housing policy.  Pl.'s Opp. at 22 (emphasis in original).  Plaintiff argues that this "information is . . . necessary for the guards own safety and the safety of the inmates."  Id.  In addition, Plaintiff asserts, without elaboration, that "[b]oth of [her] experts have testified that Mostek was in the wrong cell stating that since he was not in a safety cell . . . he should have had a cell mate and received constant observation."  Id.  In support of this assertion, Plaintiff only directs the Court to paragraph 10 of her medical expert's declaration, which states: "it is my opinion that the incompetent medical care received by decedent Mostek at the Napa County Jail was the proximate cause of his death.  Based upon all of Mostek's conditions, he should have been kept in a safety cell, or placed in a cell with another inmate and within view of an officer at all times." Williams Decl. ¶ 10.

The Court finds that Plaintiff has failed to adduce evidence showing that the County has a policy of failing to communicate housing classification information to correctional officers.  Moreover, even assuming the County has such a policy, the Court finds that Plaintiff has failed to proffer evidence that the County's deliberate indifference led to its policy of omission and that any failed communication was the moving force behind Mostek's death.  As for the placement of Mostek in a safety cell, Plaintiff has not identified any County policy or custom of omission with respect to the County's housing of inmates. Plaintiff did not present evidence demonstrating that the decision to place Mostek in Tank 1, instead of a safety cell or a cell with another inmate within view of an officer, is connected to a County policy or custom of omission that was the moving force behind Mostek's death.  Accordingly, Plaintiff has failed to avoid summary judgment by coming forward with evidence from which a jury could reasonably render a verdict in her favor. Anderson, 477 U.S. at 252.

### d.        Standard Operating Procedure of Indifference

Finally, Plaintiff contends that there is a triable issue of fact as to whether the County employed a standard operating procedure of indifference toward the inmates at the jail based upon its "numerous failures."  Pl.'s Opp. at 23.  Without citation to evidence,

Plaintiff argues "[f]or the same reasons stated above, plaintiff asserts that the failures of defendant to have, follow, and enforce proper custom and procedure is the 'standing operating procedure' of the jail. . . . [I]t is evidenced by the failures at the jail including but not limited to its failed training custom for monitoring psychological health, its policy with regard to identifying and handling suicidal inmates, its alleged policy with regard to ensuring pertinent information is passed on to the guards within the facility, its policy with regard to monitoring recidivism, and its overall apparent policy with regard to the management of the mentally ill."  Id.

The Court finds that Plaintiff's conclusory argument is insufficient to survive the County's motion for summary judgment.  Conclusory statements without factual support are insufficient to create a genuine issue of material fact for trial.  See Surrell, 518 F.3d at 1103.  The party opposing summary judgment must direct the court's attention to specific, triable facts.  See Southern Cal. Gas Co., 336 F.3d at 889.  Plaintiff has failed to adduce any evidence demonstrating that Mostek's death was the result of a longstanding practice or custom which constitutes the standard operating procedure of the local government entity and that this practice or custom was the moving force behind Mostek's death.  See Price v. Sery, 513 F.3d 962, 966 (9th Cir. 2008) (stating that plaintiffs may "establish municipal liability by demonstrating that . . . the constitutional tort was the result of a longstanding practice or custom which constitutes the standard operating procedure of the local government entity").

## 2.    Remaining State Law Claims

All of Plaintiff's remaining claims are based on state law.  The Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367.  Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise jurisdiction over supplemental state law claims if "the district court has dismissed all claims over which it has original jurisdiction."  When removal is based on the presence of a federal claim, a district court may remand pendent or supplemental state law claims to the state court once the federal claim has been eliminated.  See Lee v. City of Beaumont, 12 F.3d 933, 937 (9th Cir. 1993)

("it is generally preferable for a district court to remand remaining pendent claims to state court") overruled on other grounds, <u>California Dept. of Water Resources v. Powerex Corp.</u>, 533 F.3d 1087 (9th Cir. 2008).  Given that the federal claim has been eliminated and only state law claims remain, the Court exercises its discretion and remands Plaintiff's remaining state law claims to state court.  <u>See</u> <u>Carnegie–Mellon Univ. v. Cohill</u>, 484 U.S. 343, 351 (1988) ("When the single federal-law claim in the action was eliminated at an early stage of the litigation, the District Court had a powerful reason to choose not to continue to exercise jurisdiction."); <u>Harrell v. 20th Century Ins. Co.</u>, 934 F.2d 203, 205 (9th Cir. 1991) ("it is generally preferable for a district court to remand remaining pendant claims to state court.").

## III.    CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED THAT:

1.    Plaintiff's ex parte application for leave to supplement her opposition is DENIED.

2.    The County's motion for summary judgment is GRANTED as to Plaintiff's § 1983 claim.

3.    The Court declines to assert supplemental jurisdiction over Plaintiff's remaining state law claims and REMANDS the action to the Napa County Superior Court.

4.    The Clerk shall close the file and terminate all pending matters.

IT IS SO ORDERED.

Dated: March 29, 2013

_____
SAUNDRA BROWN ARMSTRONG
United States District Judge